# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

UNITED STATES OF AMERICA, EX          *          CIVIL ACTION NO.  08-0782
REL. GEORGE STENNETT

VERSUS                                *          JUDGE ELIZABETH E. FOOTE

PREMIER REHABILITATION               *          MAG. JUDGE KAREN L. HAYES
HOSPITAL, LLC, ET AL.

## REPORT AND RECOMMENDATION

Before the undersigned magistrate judge, pursuant to 28 U.S.C. § 636(b)(1)(B), is a

motion to dismiss for failure to state a claim upon which relief can be granted and/or to plead

fraud with particularity, Fed.R.Civ.P. 12(b)(6) and 9(b), respectively, [doc. # 58] filed by

defendants, James A. Joubert, Jr., ("Joubert"); Premier Rehabilitation Hospital, L.L.C.,

("Premier"); Bionet Medical, L.L.C. ("Bionet"); JLM Billing Solutions, L.L.C. ("JLM Billing");

and Joubert Management, L.L.C. ("Joubert Management"), sometimes collectively referred to as

"movants" or "Joubert Defendants."  For reasons assigned below, it is recommended that

defendants' motion to dismiss [doc. # 58] be GRANTED, dismissing, with prejudice, plaintiff's

complaint in its entirety.

## Background

On June 3, 2008, George Stennett filed the instant qui tam action[1] on behalf of the United

States under the False Claims Act, 31 U.S.C. §§ 3729, et seq., against the Joubert Defendants;

---

[1] "'Qui tam' is an abbreviation for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who as well for the king as for himself sues in this matter.'" *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009) (citation omitted).

Scott Markstrom ("Markstrom"); Pin Mark Enterprises, LLC ("Pin Mark"); and Home Orthotic

& Prosthetic Enterprises, LLC ("HOPE").  The False Claims Act authorizes civil suits brought by

both the "Attorney General and by private persons, termed relators, who serve as a 'posse of ad

hoc deputies to uncover and prosecute frauds against the government.'" *U.S. ex rel. Grubbs v.

Kanneganti*,  565 F.3d 180, 184 (5th Cir. 2009) (citation omitted).  Depending upon the extent of

a relator's contribution to the qui tam suit, he is entitled to receive between a ten and thirty

percent share of any recovery obtained on behalf of the government.  *Id.*

During the relevant period, Premier was a hospital in Monroe, Louisiana that accepted

medicare and medicaid payments.  (Compl., ¶ 15).[2]  Pin Mark is a Louisiana "corporation"[3] that

billed medicare for Premier and its related operations.  *Id.*, ¶ 4.  Scott Markstrom is a major

owner of Pin Mark.  *Id.*  JLM Billing is a Louisiana "corporation" that billed medicare for

Premier's Intensive Outpatient Psychiatric Services ("IOP") facilities in Monroe, Minden,

Shreveport, and Rayville, Louisiana.  *Id.*  Bionet is a Louisiana "corporation" that supplied

prosthetics to rehabilitation centers, including Premier.  (Compl., ¶ 5).[4]  HOPE is a Louisiana

"corporation" that provides therapeutic services to persons who are prescribed prosthetics in

rehabilitation centers, including Premier.  *Id.*, ¶ 6.  Joubert Management is a Louisiana

"corporation."  *Id.*, ¶ 7.  Defendants Joubert and Markstrom, "either individually or together, are

major or majority owners of all defendant corporations."  *Id.*, ¶ 8.

---

[2]  According to the motion to dismiss, Premier ceased operations in October 2008. (M/Dismiss, Memo., pg. 4).

[3]  Relator identifies Pin Mark as an "LLC."  Under Louisiana law, a limited liability company is an unincorporated association, not a corporation.  La. R.S. 12:1301A(10).

[4]  Defendants assert that Bionet ceased operations in 2009.  (M/Dismiss, Memo., pg. 4).

From March until September 2007, Stennett served as Premier's hospital administrator. *Id*., ¶ 20.  During this roughly six month period, Stennett exercised oversight of Premier's financial practices, including its billing and reimbursement practices, and its business relationship with the other defendants.  *Id*.  Stennett further alleges that he was involved in the "intricate financial operations of Premier and the other defendants . . ." (Compl., ¶ 14).  During his tenure, Stennett investigated and discovered that Premier's billing practices transgressed various provisions of the Medicare and Medicaid programs.  *See* Compl., ¶ 27.  Stennett brought these violations to the attention of Mssrs. Joubert and Markstrom "on several occasions" in April and June 2007.  *Id*.  However, he was told not to worry about the violations, and found himself out of a job by September 2007.  *Id*.

Before filing suit, Stennett served the United States with a copy of the complaint, together with a written disclosure statement.  (Compl., ¶ 12).  On September 24, 2009, the government filed a Notice of Election to Decline Intervention. [doc. # 10].  The court thereupon unsealed the complaint and ordered service.  (Sept. 25, 2009, Order [doc. # 11]).  The Joubert Defendants answered the complaint on February 23, 2010.  [doc. # 23].[5]  In their answer, the Joubert Defendants asserted that the complaint failed to state a cause of action against them and that the court lacked subject matter jurisdiction because the relator was not an "original source" of the

---

[5]  Defendant, Pin Mark, answered the complaint on July 1, 2010. [doc. # 45].  Defendant, Scott Markstrom filed an answer on July 21, 2010. [doc. # 49].  Although defendant, HOPE (along with Markstrom and Pin Mark), filed an answer on April 19, 2010, the pleading was stricken by the court.  (May 18, 2010, Order [doc. # 38]).  HOPE has yet to file a responsive pleading in this matter.

information upon which the complaint is premised, as required by 31 U.S.C. § 3730(e)(4).  *Id*.[6]

On June 14, 2010, the court set, *inter alia*, a discovery deadline of October 5, 2010,[7] a dispositive motion deadline of November 19, 2010, and a trial date of  March 21, 2011.  (June 14, 2010, Sched. Order [doc. # 40]).  On June 23, 2010, plaintiff propounded written discovery to Premier.  (Pl. M/Compel, Memo., pgs. 1-2 [doc. # 54]).

On September 30, 2010, Premier provided plaintiff with 4,145 pages of documents, without any explanation as to what they were.  *Id*.  After at least two conferences between counsel failed to resolve the discovery impasse, Premier notified plaintiff's counsel that it intended to file a dispositive motion and asked plaintiff to agree to stay discovery pending a ruling by the court.  *Id*.  Plaintiff did not agree, and instead, filed a motion to compel discovery on November 9, 2010.  [doc. # 54].  The Joubert Defendants responded on November 19, 2010, – the dispositive motion cutoff date – by filing the instant motion to dismiss for failure to state a claim upon which relief can be granted and/or for failure to plead fraud with particularity, Fed.R.Civ.P. 12(b)(6) and 9(b).  The Joubert Defendants also filed a motion to stay discovery pending resolution of their motion to dismiss.  Plaintiff filed his opposition to the motion to dismiss on December 13, 2010.  [doc. # 65].  Premier filed a reply brief on December 21, 2010. [doc. # 71].   The matter is now before the court.

---

[6]  In the parties' Rule 26(f) Case Management Report, counsel agreed that neither side challenged the court's "federal subject matter jurisdiction." [doc. # 37].  The parties further agreed to commence discovery immediately.  *Id*.

[7]  The Joubert Defendants subsequently obtained a 60 day extension of the discovery deadline.  *See* Oct. 6, 2010, Electronic Order [doc. # 53].

<u>Discussion</u>

**I.      12(b)(6) Standard**

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state

a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  A pleading states a claim for

relief when, *inter alia*, it contains a "short and plain statement . . . showing that the pleader is

entitled to relief . . ."  Fed.R.Civ.P. 8(a)(2).  Circumstances constituting fraud or mistake,

however, must be alleged with particularity.  Fed.R.Civ.P. 9(b).  A complaint filed under the

False Claims Act must satisfy the heightened pleading standard of Rule 9(b).  *Grubbs*, 565 F.3d

at 185 (citation omitted).  The particularity demanded by Rule 9(b) supplements Rule 8(a)'s

pleading requirement.  *Id*.  "A dismissal for failure to plead fraud with particularity under Rule

9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)."  *Grubbs, supra*

(*citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901

(5th Cir.1997)).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, ___

U.S. ___, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.

Ct. 1955 (2007)).  A claim is facially plausible when it contains sufficient factual content for the

court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id*.  *Plausibility* does not equate to *possibility* or *probability*; it lies somewhere in between.  *See*

*Iqbal, supra*.  Plausibility simply calls for enough factual allegations to raise a reasonable

expectation that discovery will reveal evidence to support the elements of the claim.  *See*

*Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965. Although the court must accept as true all factual

allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Iqbal, supra*.  A pleading comprised of  "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id*.

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. (citation omitted).   A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable, and that recovery is unlikely. *Twombly, supra*. Nevertheless, a court is compelled to dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827 (1989).

When, as here, plaintiff alleges fraud, the complaint must further specify "the time, place and contents of the false representation[ ], as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Grubbs, supra* (citation omitted). However, the "'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)." *Grubbs*, 565 F.3d at 190.  Moreover, "[m]alice, intent, knowledge, and other conditions of a person's mind" are subject to the general pleading requirements of Rule 8(a). *Iqbal*, 129 S.Ct. at 1954.

When considering a motion to dismiss, courts generally are limited to the complaint and its proper attachments. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted).  Nonetheless, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id*.

## Discussion

The Joubert Defendants seek dismissal of the complaint because they contend that it fails

6

to meet the minimum pleading requirements mandated by Rules 8(a) and 9(b), but that even if it

did, the court lacks subject matter jurisdiction because of the False Claims Act's "public

disclosure bar."  Because the "public disclosure bar" is jurisdictional, albeit intertwined with the

merits of the case and thus to be considered in the context of a 12(b)(6) motion or a motion for

summary judgment, the court is obliged to resolve this issue first.  *See U.S. ex rel. Reagan v. East*

*Texas Medical Center Regional Healthcare System*, 384 F.3d 168, 173 (5th Cir. 2004) (citation

omitted); *U.S. ex rel. Laird v. Lockheed Martin Engineering and Science Services Co.*, 336 F.3d

346, 350-351 (5th Cir. 2003) (court should consider the jurisdictional bar before it reaches the

merits of an affirmative defense), *abrogated on other grounds by*, *Rockwell Intern. Corp. v.*

*United States*, 549 U.S. 457, 127 S.Ct. 1397 (2007).

## I.     Public Disclosure Bar

The False Claims Act's "public disclosure" provision withholds jurisdiction over an

action that is "based upon the public disclosure of allegations or transactions in a criminal, civil,

or administrative hearing, in a congressional, administrative, or government accounting office

report, hearing audit, or investigations, or from the news media, unless . . . the person bringing

the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A).  Until its recent

amendment,[8] the "public disclosure bar" extended to disclosures issued by state and local

sources, including audit reports issued by those authorities.  *See Graham County Soil and Water*

*Conservation Dist. v. U.S. ex rel. Wilson*, ___ U.S.___, 130 S.Ct. 1396 (2010).

---

[8]  The Patient Protection and Affordable Care Act, Pub.L. 111-148, 124 Stat. 119, § 10104(j)(2), signed into law on March 23, 2010, amended 31 U.S.C. § 3730(e)(4).  *Id*.  The new legislation, however, does not apply retroactively to pending cases.  *Id*.  Accordingly, the court will apply the pre-amendment version of the statute.

Resolution of this issue requires the court to consider three questions:  "(1) whether there has been a 'public disclosure' of allegations or transactions, (2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and (3) if so, whether the relator is the 'original source' of the information."  *Id*.  One of the purposes of the jurisdictional bar is to thwart "parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud."  *U.S. ex rel. Reagan v. East Texas Medical Center Regional Healthcare System*, 384 F.3d 168, 173 -174 (5th Cir. 2004) (citation omitted).

a)   <u>Public Disclosure upon which the Qui Tam Action is Based</u>

Movants contend that the allegations which provide the foundation for the instant complaint were publicly disclosed in a June 29, 2007, report issued by the State of Louisiana in the wake of its June 2007 audit of Premier's operations.  The relator does not dispute that the state conducted a survey in June 2007.  *See* Compl.,¶ 4; Opp. Memo., pg. 2.  In fact, as he explains, the audit was a "periodic inspection done by the State Survey Agency to gather information about the facility to determine compliance with the requirements of participation in the Medicare and Medicaid programs." (Opp. Memo., pg. 2).  Portions of the survey report are attached to the complaint, and therefore, may be considered by the court.  *Dorsey, supra*.  Thus, the answer to the first question of the public disclosure analysis is an uncontroverted "yes."  *See Reagan, supra*.

With regard to the second inquiry, the Fifth Circuit has held that "if a qui tam action is "even partly based upon public allegations or transactions" then the jurisdictional bar applies. *U.S. ex rel. Fried v. West Independent School Dist.*,  527 F.3d 439, 442 (5th Cir. 2008) (citation and internal quotation marks omitted).  The claims alleged in a quit tam suit are deemed "based

8

upon" the publicly disclosed allegations when both sets of allegations are substantially similar.

*U.S. ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*,  668 F. Supp.2d 780, 796-797 (E.D. La.,2009) (Vance, J.).

Here, the state survey report found *inter alia*,

[b]ased on review of governing body meeting minutes and interview with the administrator and S1, director of the management company for the four IOPs that operated under the hospital's Medicare provider number, the governing body failed to ensure the off-site campuses operated under the hospitals's [sic] governing body.
Findings:

In an interview on 6/25/07 at 9:00AM, the hospital administrator[9] reported the hospital has four IOPs operating under the hospital's Medicare provider number and further stated three of the IOPs were located off-campus from the hospital. **The administrator also reported he was hired in April 2007 and knew nothing about the IOPs because a management company was responsible for them.**

An interview on 6/25/07 at 11:45AM with S1, director of the management company for the four IOPs revealed he is responsible for ensuring the IOPs are staffed with licensed personnel and has a psychiatrist for each program.  When questioned if a doctor is present in the building at the offsite IOPs during therapy sessions, S1 replied, not at IOP-B.  He further stated a medical doctor was present in the building next to IOP-D, but a driveway separated the doctor's building from the IOP.

Review of the hospital's physician roster provided by human resources failed to reveal the physicians named by S1 as providing services to the IOPs (S3,S4, and S5) were on staff at the hospital.  Review of governing body meeting minutes from 2006 through present failed to reveal the doctors were appointed to the medial [sic] staff or credentialed at this hospital.

*          *          *

Based on review of 3 of 3 medical records for patients in Intensive Outpatient Psychiatric Program-B, (IOP-B) (patient # 2, #3, and #7) and 1 of 3 patients in IOP-A (Patient #4), review of IOP policies and procedures, and interview with the

---

[9]  Presumably, Stennett, as he was Premier's administrator during this period.

administrator, owner of the hospital, and S1, director of the management company for the IOPs, the hospital failed to meets [sic] the needs of patients in accordance with acceptable standards of practice.  This was evidenced by the failure to ensure: 1) history and physicals, and psychiatric evaluations were done with timeliness specified in IOP policies, 2) patients were admitted only by physician orders, 3) care plans were developed for each patient, and 4) a psychiatrist assessed each patient at least every thirty-one days to determine if the patient would benefit by continuing outpatient psychiatric therapy.
Findings:

In an interview on 6/25/07 at 9:00AM, **the hospital administrator reported the hospital has four IOPs operating under its Medicare provider number.  The administrator also reported he was hired in April 2007 and was not informed of the daily operations of the IOPs because a management company was responsible for them**. . . .
(June 29, 2007 State Survey Report; Compl., Exh. 4) (emphasis added).

Stennett's claims against defendants are broadly grouped into six categories:

1)  Premier Hospital improperly treated its off-site, remote Intensive Outpatient Psychiatric facilities ("IOPs") as "provider-based" facilities exempt from obtaining a Medicare provider number, when, in fact, they failed to meet the various criteria for the exemption; (Compl., ¶¶ 27(c), (h), (i), (k), & (l));

2)  the expenses of the IOPs, HOPE, and Bionet were improperly charged to Premier, causing Premier to show a financial loss for which it obtained reimbursement from Medicare for years 2005, 2006, and 2007; *Id*., ¶¶ 27(b) & (e);

3)  billing Medicare for multiple occupational and physical therapy sessions without proper supervision; *Id*., ¶¶ (d), (f), & (g);

4)  admitting family members as patients without charging for services and without meeting admission requirements, thereby increasing Premier's financial loss for which it claimed reimbursement (presumably from Medicare); *Id*., ¶ 27(j);

5)  double-billing for transportation of patients to and from Premier; *Id*., ¶ 27(a); and

6)  billing for services that did not meet Medicare requirements.  *Id*., ¶ 26.

10

Upon comparison, it is manifest that the first two categories of claims are substantially similar to the findings contained in the state audit.  Therefore, these claims are barred unless Stennett qualifies as an "original source."  *See Branch, supra*.

Although not addressed by the parties, the court observes that the exhibits attached to the complaint further suggest that there was a "public disclosure" of improper supervision and record-keeping by physical therapists as a result of an "investigation" by the State Board of Physical Therapy which appears substantially similar to the third category of allegations in the relator's complaint.  In fact, the complaint cites to one of these exhibits (a July 23, 2007, e-mail) when recounting defendants' alleged wrongdoing.  *See* Compl., ¶¶ 27(d) & (g).  The e-mail was sent from Stennett to Mssrs. Joubert and Markstrom, and reads,

> "[a] former physician and a former employee has [sic] filed a complaint on us with the State Board of Physical Therapy.  That is all of the information they would relay to me until they investigated the complaint.  The lady said it was really no big deal but they had to investigate it."

(July 23, 2007, e-mail; Compl., Exh. 2).

In addition, Barbara Holloway (presumably an employee of Premier or one of the related affiliates), sent an e-mail on January 25, 2008, to Joubert, Markstrom, and others, stating that a former employee, Amy Stewart, had reported the lack of supervision of the physical therapists to the state physical therapy board.  (Jan. 25, 2008, e-mail, Compl., Exh. 2).[10]

The foregoing exhibits demonstrate that the issue of inadequate physical therapist supervision was the subject of an investigation by a state board or agency.  Accordingly, relator's third category of claims is barred also, unless Stennett qualifies as an "original source."  *See*

---

[10]   In the e-mail, Holloway expressed her reluctance to compound any regulatory transgression by altering patient charts, as apparently favored by Markstrom.

*Branch, supra.*

b)      Original Source

An "original source" is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B).[11]  The relator must demonstrate that he is the "original source" for each claim that otherwise is subject to the public disclosure bar.  *See Rockwell Intern. Corp.*, 549 U.S. at 477, 127 at 1411; *Reagan, supra* (relator need not demonstrate direct and independent knowledge of each false claim set forth in his complaint).

Here, Stennett alleged that he provided the U.S. Attorney with a copy of the instant complaint and a written disclosure statement *before* he filed suit.  (Compl., ¶ 12).  Thus, the sole, albeit multi-faceted, inquiry is whether Stennett had direct and independent knowledge of the information upon which his allegations are based.[12]

The term "direct" requires "knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." *Reagan, supra* (citation omitted).  Direct knowledge contemplates knowledge obtained from actually viewing source documents, or first hand observation of the fraudulent activity that

---

[11]     The Patient Protection and Affordable Care Act, Pub.L. 111-148, 124 Stat. 119, § 10104(j)(2), signed into law on March 23, 2010, changed the requirements for an "original source" under 31 U.S.C. § 3730(e)(4)(B). The new legislation, however, does not apply retroactively to pending cases.  *See Graham County Soil and Water Conservation Dist., supra.*

[12]   "[I]nformation on which the allegations are based" references the information on which the *relator's* allegations are based, not the information upon which the publicly disclosed allegations that triggered the public-disclosure bar are based.  *Rockwell Intern. Corp., supra.*

provides the grounds for the qui tam suit. *Branch, supra* (citing *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 287 Fed. Appx. 396 (5th Cir. July 22, 2008) (unpubl.)). The relator's knowledge is deemed "independent" if it does not derive from the public disclosure. *Id*. Although the relator need not show that he knew about the fraud before the public disclosures, his prior knowledge of the information upon which his complaint is based may help demonstrate that he obtained the information independent of the public disclosure. *Branch*, 668 F. Supp. 2d at 801-802; *but see, Reagan, supra* (the Fifth Circuit has "yet to decide whether a party who independently and directly learns of information already publicly disclosed may qualify as an independent source").  In its assessment, the court is called to "look to the factual subtleties of the case before it and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." *Reagan*, 384 F.3d at 177 (citation and internal quotation marks omitted).

Applying the foregoing considerations here, the undersigned finds that the relator's complaint fails to demonstrate that he was an original source for the information that forms the bases for his first three categories of claims.  With regard to the first two categories, Stennett alleges that he did not become aware of regulations regarding billing practices until "after" the state survey.  (Compl., ¶ 21).  He adds that "[t]hereafter" he learned that Premier's satellite facilities should not bill to Medicare because they did not meet the necessary requirements.  *Id*.

However, in his opposition brief, relator argues that his investigation occurred prior to the state survey, and that the complaint inadvertently stated that his investigation transpired "after" the state survey.  (Opp. Memo., pgs. 4-5).  Indeed, in an undated timeline attached to his

13

complaint, Stennett indicated that he "discovered [on June 16, 2007] that IOP's were not operating legally and gave notice to Jimmy Joubert about this.  His remarks were 'I take care of IOP's.'" (Timeline; Compl., Exh. 1).[13]

Nevertheless, according to the state audit report attached to the complaint, Stennett stated that he "knew nothing about the IOPs . . ."  (June 29, 2007 State Survey Report; Compl., Exh. 4). Of course, when an allegation in a complaint is contradicted by an attached exhibit, then the exhibit, not the allegation, controls. *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) (citation omitted).

Furthermore, the complaint is devoid of any factual allegations to explain how Stennett obtained "direct" knowledge of defendants' fraudulent billing practices associated with its IOPs, HOPE, and Bionet.  Although Stennett alleges that he is the "original source of, and has direct and independent knowledge of, any and all allegations herein . . .,"[14] this is a legal conclusion that is not entitled to any weight.  *See Iqbal, supra*.  Moreover, Rule 8(a) requires "that the complaint clearly set out the basic facts necessary to support the conclusion that there is [f]ederal jurisdiction.  *Fountain v. New Orleans Public Service, Inc.*, 265 F. Supp. 630 (E.D. La. March 6, 1967) (citation omitted); Fed.R.Civ.P. 8(a)(1).  Relator fails to meet that burden here.[15]

Finally, with regard to Stennett's claims that defendants improperly billed Medicare for

---

[13]  Moving defendants urge the court to assign no weight to this "self-serving timeline." (M/Dismiss, Memo., pg. 19).  Defendants' argument, however, overlooks the court's obligation at the pleading stage to accept the veracity of plaintiff's factual allegations.

[14]  Compl., ¶ 12.

[15]  Stennett may seek leave to amend his complaint to cure the deficient jurisdictional allegations, in the event that he has a good faith basis for doing so.  *See* 28 U.S.C. § 1653.

14

multiple occupational and physical therapy sessions without requisite oversight, the court observes that the exhibits attached to the complaint contradict Stennett's assertion that he reported these violations to the State Physical Therapy Board.  *See* discussion, *supra*.  The court reiterates that when an allegation in a complaint is contradicted by an attached exhibit, then the exhibit, not the allegation, controls.  *Riley, supra*.  Moreover, there are no factual allegations to establish that Stennett was a direct source of this information.  Rather, the exhibits attached to the complaint confirm that he became aware of the irregularities through secondary sources, including an e-mail that was drafted several months after his brief tenure at Premier had ended.[16]

## II.    Scienter and other Pleading Deficiencies

Because some of the relator's claims are not jurisdictionally curtailed by the False Claims Act's public disclosure bar, the court must address whether these unbarred claims suffice to state a claim.  Moreover, because the relator ultimately may cure the jurisdictional deficiencies associated with his barred claims, the ensuing analysis contemplates these claims, as well.

The False Claims Act prohibits three distinct, but overlapping practices: "1) the presentment of a false claim to the Government, 2) the use of a false record or statement to get a false claim paid, and 3) conspiracies to get a false claim paid."  *Grubbs, supra* (citing 31 U.S.C. §§ 3729(a)(1-3)).[17]  The instant complaint does not invoke any specific subsection of § 3729.  In

---

[16]  Information obtained through conversations and e-mail exchanges are not the type of direct and independent knowledge contemplated by the False Claims Act.  *See Fried*, 527 F.3d at 443.

[17]  In 2009, Congress passed the Fraud Enforcement and Recovery Act ("FERA"), Pub.L. No. 111-21, 123 Stat. 1617 (2009), which, *inter alia*, amended and renumbered §§ 3729(a)(1-3) as §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(C).  *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2nd Cir. 2010), *cert granted*, *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, ____ U.S. ___, 131 S.Ct. 63 (Sep 28, 2010).  The 2009 amendments to the False Claims Act generally

brief, however, the relator enumerates the elements for recovery under all three subsections.  *See* Opp. Memo., pgs. 6-7.  Accordingly, the court's analysis will contemplate all three causes of action.

Section 3729(a)(1) imposes liability upon any person who "knowingly presents, or causes to be presented" a false claim to the government.  *Grubbs, supra* (citing 31 U.S.C. § 3729(a)(1)).  Elements of this claim require the 1) knowing 2) presentment of 3) a false or fraudulent claim.  *Id*.[18]  To comply with Rule 9(b), a relator need not always allege the details of an actually submitted false claim, so long as he is able to provide "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted . . . such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into . . ."  *Grubbs*, 565 F.3d at 190.

Section 3729(a)(2) requires proof that

> the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid by the Government. For this section, the recording of a false record, when it is made with the requisite intent, is enough to satisfy the statute; [the court] need not make the step of inferring that the record actually caused a claim to be presented to the Government.

*Grubbs, supra*.

Stated another way, a successful § 3729(a)(2) claim requires proof that the defendant "intended

---

apply to conduct occurring on, or after May 20, 2009.  *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n1 (5th Cir. 2010).  However, the changes to § 3729(a)(1)(B) apply retroactively to all claims "pending on or after June 7, 2008."  *Id*.  Here, the instant claims all arose prior to June 7, 2008, and suit was filed prior to that date.  Accordingly, the court will consider §§ 3729(a)(1-3) in their pre-amendment form.

[18]  Liability under § 3729(a)(1) does not require actual or specific damages, because the statute contemplates liquidated penalties.  *Id*.

that the false record or statement be material to the [g]overnment's decision to pay or approve the false claim." *U.S. ex rel. Rafizadeh v. Continental Common, Inc.*,  553 F.3d 869, 873 -874 (5th Cir. 2008) (citing *Allison Engine Co. v. United States ex rel. Sanders*, ___ U.S. ___, 128 S.Ct. 2123, 2126 (2008)).  The relator must show that defendants had knowledge of the alleged falsehoods in the documents at issue.  *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008).

To prove a conspiracy under § 3729(a)(3) of the False Claims Act, a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the government] and (2) at least one act performed in furtherance of that agreement." *Grubbs, supra*.  Rule 9(b)'s particularity requirements apply to § 3729(a)(3).  An agreement may be inferred when it is a natural consequence of the factual allegations.  *Id.*[19]

To establish that a defendant violated the False Claims Act, the relator must demonstrate "guilty knowledge of a purpose on the part of [the defendant] to cheat the Government, or knowledge or guilty intent."  *U.S. ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (citations and internal quotation marks omitted).  By its terms, the False Claims Act does not require "proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1)(B).  Rather, for purposes of § 3729, the terms "knowing" and "knowingly:"

(A) mean that a person, with respect to information--

(i)       has actual knowledge of the information;

(ii)      acts in deliberate ignorance of the truth or falsity of the information; or

---

[19] As with § 3729(a)(2), presentment of a false claim is not an element of a conspiracy claim, and thus need not be pled.  *Id.*

17

(iii)    acts in reckless disregard of the truth or falsity of the information; . . . 31 U.S.C. § 3729(b)(1).

Negligence or even gross negligence does not suffice.  *Farmer, supra*.  Thus, "mismanagement-alone-of programs that receive federal dollars" does not impose liability under the False Claims Act.  *Farmer*, 523 F.3d at 339 (citation omitted).  Similarly, failure to comply with agency regulations, without the requisite culpability, does not constitute fraud.  *See U.S. v. Southland Management Corp.*, 326 F.3d 669 (5th Cir. 2003) (citation omitted).

With this appreciation of the governing law, the court finds that, at least in its current form, the relator's complaint fails to state a claim against defendants under the False Claims Act. At a minimum, relator's allegations regarding scienter are fatally sparse.  For instance, the complaint asserts that "[r]elator brought *these discrepancies* to Defendant Jouberts' [sic] attention in April 2007 and was informed that the services were legal."  (Compl., ¶ 24) (emphasis added).  First, it is not clear what discrepancies this paragraph refers to.  Second, even if the court assumes that relator is referring to the allegations contained in the preceding paragraph,[20] Joubert's alleged comment that the "services were legal" does not support an inference that he knowingly presented a false claim or knowingly completed a false record.  This allegation more likely suggests that Joubert thought the "services" were legal.

Later in the complaint, Stennett alleges that he brought "these violations to the attention of Markstrom and Joubert on several occasions in April and June of 2007."  (Compl., 2nd ¶ "27").  However, he was told "not to worry about the violations."  *Id*.  Again, assuming that "these

_____

[20]  The paragraph reads, "[r]elator further became aware that Premier's provider number was used to bill services for these off-site facilities even though the patients were not admitted to Premier but to the off-site facilities."  (Compl., ¶ 23).

violations" refers to the laundry list of alleged wrongdoing enumerated in the preceding

paragraph, defendants' alleged response, without further explication of the context, does not

plausibly suggest conscious wrongdoing.

Furthermore, in his "timeline" attached to the complaint, Stennett stated that on June 16,

2007, he discovered that the "IOP's were not operating legally and gave notice to Jimmy Joubert

about this." (Timeline; Compl., Exh. 1).  Joubert responded, "I take care of IOP's."  *Id*.  Stennett,

however, does not elaborate upon what he told Joubert they were doing wrong.  Indeed, during

the state audit that occurred just a few days later, Stennett told investigators that he knew nothing

about the IOPs. (June 29, 2007 State Survey Report; Compl., Exh. 4).

Stennett also attached to his complaint a post-discharge e-mail exchange between himself

and Paul Lejeune wherein Stennett conceded that Joubert

> wanted someone up here to at least think he was aware of wrong-doing and he
> was correcting it - maybe.  **I am so unsure of his actions now I would even
> second guess my second guess.** . . . Why, knowing all of this months ago,
> especially about amount of money Premier deposited for him, checks in the mail,
> not electronic money, did he not act?  Something has triggered his thought process
> . . . maybe legitimately, maybe him wanting you to tell me, maybe a lot of things.
> **At this point, I am really unsure.**"

(Undated – perhaps Sept. 30, 2007, e-mail; Compl., Exh. 2) (emphasis added).

Stennett's frank, unguarded assessment of Joubert's state of mind further undermines the

relator's ambiguous assertions of scienter.  Stennett's candid acknowledgment that he was not

sure whether one of the principal defendants harbored the requisite culpable mindset, undermines

his efforts to elevate his suspicions and accusations of intentional wrongdoing above the

speculative level.  Mere speculation, however, does not satisfy the plausibility standard

compelled by the Rules of Civil Procedure.  *See Iqbal, supra.*[21]

In the absence of sufficient allegations that plausibly demonstrate any particular defendant's culpability, the court is hard-pressed to discern any plausible basis to conclude that there was an illicit agreement among defendants – as required to support a conspiracy claim.  *See Grubbs*, 565 F.3d at 194 (even if defendant-doctors submitted false claims over a period of years, this does not, by itself, indicate more than the possibility of an agreement among them).

The foregoing analysis applies to all of relator's claims.  However, the court pauses to highlight other pleading deficiencies (in the event relator is inclined, and able to amend his complaint to redress the court's other concerns).  For instance, with regard to plaintiff's fourth category of claims – admission of family members as patients without charging for services or meeting admission requirements – relator refers to one instance where Scott Markstrom admitted his mother to the facility.  *See* April 16, 2007, E-mail from Scott Markstrom to DeWain Stennett, et al.; Compl., Exh. 2.  The complaint does not allege, however, how the admission transgressed applicable requirements, how the relator came to know that Premier was not compensated for the stay, or how this resulted in a false claim to the government.  Rather, the e-mail exchange ends with Stennett asking Markstrom to forward the necessary billing or contact information.  *See* April 16, 2007, E-mail from DeWain Stennett to Scott Markstrom,  et al.; Compl., Exh. 2.

---

[21]  Relator attempts to expound upon the circumstances of his conversations with Joubert and Markstrom in his opposition brief.  *See e.g.*, Opp. Memo., pgs. 2, 14.  At this juncture, however, relator has not sought to amend his complaint to add these allegations.  Moreover, as these conversations with Joubert and Markstrom occurred prior to Stennett's discharge, it is not at all clear that further explanation of the conversations will overcome relator's later admission that he remained unsure of Joubert's ill intent.  *See* discussion, supra.  In fact, according to the timeline, the original focus of Stennett's post-termination discontent was Scott Markstrom for alleged defamation of character.  *See* Timeline.

For purposes of his claim that defendants double-billed Medicare and Medicaid for transportation expenses, relator cites to a June 16, 2007, e-mail attached to the complaint.  *See* Compl., ¶ 27(a).  Upon review, however, the e-mail simply seeks certain codes and billing logs to determine what had been paid or denied, and to ensure that bills were not duplicated.  (June 16, 2007, e-mail from Marilyn North to Dewain Stennett; Compl., Exh. 2).  According to the e-mail chain, Stennett solicited Scott Markstrom's assistance.  *Id*.  On June 20, 2007, Markstrom replied to Stennett, stating that he would follow-up to ensure that the necessary information was sent out. (June 20, 2007, e-mail from Markstrom to Stennett; Compl., Exh. 2).

This e-mail exchange falls considerably short of plausibly showing that defendants knowingly double-billed transportation expenses.  In fact, the e-mails fail to show more than a possibility that defendants even double-billed at all.  The federal rules require more.  *See Iqbal, supra*.

Stennett also faults defendants for billing for services that failed to meet Medicare requirements.  (Compl. ¶ 26).  He cites one example "involving state insurance" where an obese, double-amputee received prosthetics and was advised that she could walk again.  *Id*.  The False Claims Act, however, contemplates acts of fraud committed against the federal government, not the failure to comply with the requirements of state insurance law.  Furthermore, in a report attached to the complaint, Stennett discussed an incident with a double-amputee that appears to be the same incident recited in the complaint.  *See* Admin. Weekly Report, ending July 20, 2007; Compl. Exh. 3).  Stennett indicated that an employee named "Kim" advocated for the admission of the unqualified patient; he added, however, that Kim had become much better about her boundaries.  *Id*.  Again, these allegations do not plausibly show that defendants knowingly

falsified records for payment or knowingly presented false claims for payment.

The undersigned further credits movants' argument that the complaint fails to state any actionable claim against defendants Joubert Management or JLM Billing.  The complaint includes no specific allegations against Joubert Management.  It also alleges that JLM Billing "*currently*–bills Medicare" for Premier's operations.  (Compl., ¶ 4) (emphasis added).  However, the complaint seeks recovery for false claims that occurred in 2007, not at the time suit was filed in 2008.

### III.    Non-Moving Defendants

Although defendants Scott Markstrom, Pin Mark, and HOPE did not join in the instant motion, the court observes that, because the allegations in the complaint are asserted generally against all defendants through their "owners," Joubert and Markstrom, the reasons that support dismissal of relator's claims against movants likewise support dismissal of the claims against the non-moving defendants.  Moreover, the court possesses inherent authority to dismiss an action *sua sponte,* without motion by a defendant.  *McCullough v. Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962).  A "district court may dismiss an action on its own motion under Rule 12(b)(6) 'as long as the procedure employed is fair.'" *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998); *see also McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (the report and recommendation itself provides adequate notice to the parties) (citing *Magourik v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998)).

### IV.    Fees and Expenses

Movants seek an award of attorneys' fees and expenses under 31 U.S.C. § 3730(d)(4). The statute provides that,

> (4) If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was *clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment*.

31 U.S.C. § 3730(d)(4) (emphasis added).

An action is not frivolous if it is supported by existing law or a reasonable suggestion for its extension, modification, or reversal.  *U.S. ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 874-875 (5th Cir. 2008) (citation omitted).  Further, "[a]n action is clearly vexatious or brought primarily for purposes of harassment when the plaintiff pursues the litigation with an improper purpose, such as to annoy or embarrass the defendant."  *Id*.  (citation and internal quotation marks omitted).  Moreover, "the award of fees under the false claims act is reserved for rare and special circumstances." *Id*.

At this juncture, the court is not persuaded that fees and expenses are warranted.  First, relator still may amend his complaint to state a claim against one or more defendants.  Second, even if relator does not possess a good faith basis to amend his complaint, and thus, necessarily foregoes amendment, the instant motion represents the initial review of the sufficiency of his allegations by an impartial source.  In other words, "rare and special circumstances" are not present.

## V.    Amendment

The court is obliged to "freely" grant leave to amend "when justice so requires." Fed.R.Civ.P. 15(a)(2).  As discussed above, it is conceivable that relator can cure his deficient pleadings via amendment, at least as to one or some defendants.  To date, however, relator has

not sought leave to do so.[22]  Therefore, the instant recommendation of dismissal is subject to

relator's right to seek leave of court to amend his complaint with a proposed pleading that cures

the deficient allegations.[23]

## CONCLUSION

For the foregoing reasons,

**IT IS RECOMMENDED** that the motion to dismiss for failure to state a claim upon

which relief can be granted and/or to plead fraud with particularity, Fed.R.Civ.P. 12(b)(6), [doc.

# 58] filed by defendants James A. Joubert, Jr.; Premier Rehabilitation Hospital, L.L.C.; Bionet

Medical, L.L.C.; JLM Billing Solutions, L.L.C.; and Joubert Management, L.L.C., be

**GRANTED**, and that plaintiff's claims against said defendants be **DISMISSED WITH**

**PREJUDICE**, subject to plaintiff's right to seek leave of court to amend his complaint with a

proposed pleading that cures the deficient allegations against some or all defendants, within the

deadline to file objections to this report and recommendation

For the same reasons, **IT IS RECOMMENDED** that plaintiff's claims against

defendants Scott Markstrom; Pin Mark Enterprises, LLC; and Home Orthotic & Prosthetic

Enterprises, LLC be **DISMISSED WITH PREJUDICE**, subject to plaintiff's right to seek leave

of court to amend his complaint with a proposed pleading that cures the deficient allegations

against some or all defendants, within the deadline to file objections to this report and

---

[22]  The court observes that although the deadline for amendments has passed, the deficiencies in the complaint were not exposed until defendants' recently filed motion to dismiss.

[23]  In any future briefs to the court, counsel (for both sides) shall support their arguments with governing case law from this circuit, i.e. the Supreme Court and/or the United States Court of Appeals for the Fifth Circuit.  As seen herein, there is no shortage of authority from this circuit on the issues presented in this case.

recommendation

**IT IS FURTHER RECOMMENDED** that defendants' request for fees and expenses be

**DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)© and Fed. R. Civ. P. 72(b), the parties

have **fourteen (14) days** from service of this Report and Recommendation to file specific,

written objections with the Clerk of Court.  A party may respond to another party's objections

within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any

objection or response or request for extension of time shall be furnished to the District Judge at

the time of filing.  Timely objections will be considered by the District Judge before he makes a

final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS
REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE
SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,
FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL
FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED, in chambers, at Monroe, Louisiana, this 21st day of January

2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE